LACEY E. BUTNER, RESPONDENT, v. UNION PACIFIC RAILROAD COMPANY, A CORPORATION, APPELLANT.—163 S. W. (2d) 100.

Kansas City Court of Appeals. May 25, 1942.

*Brown, Douglas & Brown* for appellant.

*Lewis F. Randolph* and *Nile L. Vermillion* for respondent.

BLAND, J.—This is an action by plaintiff, a former employee of the defendant, for his wrongful discharge. There was a verdict and judgment in favor of plaintiff in the sum of $3000, and defendant has appealed.

Plaintiff began his employment with the defendant on or about September 26, 1918, and continued to work for it, with the exception of a few years thereafter, until February 25, 1932, on which latter date he was discharged. At that time he was working as an engine foreman, his work being largely confined to defendant's Armstrong Yards in Kansas City, Kansas.

On the evening of February 24, 1932, plaintiff and a fellow employee. Wilcox. came to work together in plaintiff's car. They went on

duty at twelve o'clock midnight. Plaintiff first saw Hagan, night yard-master for defendant, and secured some orders from him. Plaintiff then went about his work. About two o'clock A. M., he was removed from duty by Hagan. It is claimed by defendant that he was removed on account of being in an intoxicated condition at the time. Defendant had a Rule "G" which provided: "The use of intoxicants by employees while on duty is prohibited. Their use, or the frequenting of places where they are sold, is sufficient cause for dismissal."

Plaintiff testified that Hagan came to where he was working and stated: "Come on, I am going to call another man in your place; you are not fit to handle cars. Wilcox is asleep in the engine and N. A. Williams is in town, the general superintendent. What do you want to do? Get us all fired? What did you bring Wilcox to work in that condition for? . . . What did you want to bring him to work under the influence of intoxicating liquor for?"

Plaintiff further testified that Hagan told him he was taking him out of service and the reason he gave was that plaintiff had brought Wilcox to work when the latter was drunk; that Hagan did not criticize plaintiff's work; that Hagan's sole excuse for firing him was that Hagan had caught Wilcox in the engine asleep, and that plaintiff had brought him to work. The evidence shows that plaintiff and Wilcox did not work in the same crew.

Plaintiff and Wilcox then changed their clothes and about thirty minutes thereafter appeared at the home of one Gaskill, who was the general yard-master for the defendant.

Plaintiff testified that he told Gaskill "that Mr. Hagan had just pulled me out of service and told me I wasn't in fit condition to handle cars and began bawling me out for bringing Wilcox in the condition he was in and he (Gaskill) said to me, 'Well, go on home and we will see about it in the morning.' Tell the jury whether or not you asked Mr. Gaskill to look you over? A. 'Yes, sir, Mr. Gaskill, do you see anything wrong with me?' I said, 'Mr. Hagan said I wasn't fit to handle cars.' And he said, 'No, I don't; see anything wrong with you.'"

Plaintiff further testified that he had a bottle of cough medicine with him; that Gaskill or one of the latter's clerks called him up the next morning and told him to come down that Gaskill wanted to take a statement from plaintiff; that on the way down he met Grimes, who was the chairman of the local grievance committee of the Brotherhood of Railroad Trainmen, of which plaintiff was a member, and "I asked him to come to represent me, that Mr. Gaskill was going to hold an investigation, so he went on in his office and he (Gaskill) took a statement from me;" that when he got to Gaskill's office, Gaskill told plaintiff that he wanted a statement about the events of the preceding night; that he asked plaintiff a few questions about his service record and then, without preliminary, he told plaintiff that

he was going to stand on the statement that Hagan had given him, and dismissed plaintiff; that Gaskill. did not read any charge to plaintiff at the time.

Plaintiff further testified that he did not know or understand that there was an investigation being held by Gaskill; that he did not know this for sometime after he was dismissed and that he did not know why he was discharged.

In plaintiff's petition he pleaded Rules 12 and 24 of the contract between the Brotherhood of Railroad Trainmen and the defendant. Rule 12, provided: "*Complainants or charges.* When complaints or charges are made against any yardman by other yardmen, they shall be put in writing and convey a full and clear understanding of such complaints or charges, which will be read into the investigation." Rule 24, provided: "*Investigation.* Before a yardman is discharged, or notation made against his record, for an alleged fault, he shall have a fair and impartial hearing, at which he may have an employee of his choice to represent him, who will be permitted to examine the witnesses. Copy of the evidence brought out at such investigation, which will be the basis for the discipline administered, shall be accessible to employee affected or his representative upon request. When suspended for investigation, such investigation, shall be held within three days. . . . When notation is entered against the record of a yardman he will be furnished a copy and receipt for it. If the notation against his record is decided unjust it will be eliminated."

Plaintiff pleaded that he was discharged in violation of Rules 12 and 24, in that, "no notice was served upon plaintiff advising him in advance and with particularity and certainty of the exact nature of the charge placed against the plaintiff; that no reasonable notice was served upon the plaintiff of the time and place of hearing; that the plaintiff instead of being given an opportunity to have and present witnesses in his behalf, was singly brought before one Robert Gaskill, an investigating officer for defendant company, and was not given or afforded a fair and impartial hearing, in that no witnesses were presented to testify against the plaintiff, although plaintiff denied being guilty of any fault or charge made against him, and plaintiff was given no opportunity to have and present witnesses in his own behalf; that the alleged hearing afforded to plaintiff and conducted by defendant was only a mock or pretended hearing and a mere sham and a farce, which did not comply with the terms of said contract."

Plaintiff also pleaded Rule 12 relating to seniority rights of defendant's employees, including the plaintiff.

There was evidence on behalf of plaintiff that he was not intoxicated at the time he was removed from service by Hagan, and there was testimony on the part of defendant that he was. Wilcox, who testified for defendant, stated that plaintiff was intoxicated when he went to work, and that when they appeared at Gaskill's house, the latter told

plaintiff, "You are drunk, I smell liquor, report for investigation;" that on the next day, when plaintiff reported for investigation, and on the way down, plaintiff said he was going to get a bottle of cough medicine and told Wilcox he ought to get one too. Wilcox denied that plaintiff had a bottle of cough medicine with him when they saw Gaskill at the latter's house. Wilcox was not present at the investigation of plaintiff.

The proceedings at the investigation or hearing were taken down in shorthand by a clerk employed by the defendant. His notes were transcribed and the transcript was introduced in evidence by defendant. It shows that the following occurred at the hearing: Gaskill opened the hearing by stating: "Mr. Grimes I have a report here" from Hagan, reading as follows:

"At midnight, Feb. 25, 1932, making observation of employees coming on duty, I was not thoroughly satisfied with the condition of Foreman, Wilcox and Foreman, Butner; as it appeared to me, I permitted them to go to work and watched them closely.

"Wilcox arrived at Yard office after taking No. 11 track across the river, at 1:50 A. M. I inquired of his helpers, Burnett and Billings, as to the whereabouts of their foreman, and was advised that he was in the engine deck, asleep and intoxicated. He was immediately relieved from service, and extra watchman, J. C. Jones called to replace him, with Burnett in charge of the crew for remainder of shift; and Wilcox was instructed to report to you for investigation.

"I then went to East lead where Butner was handling a cut stock off K. F., and found him in an intoxicated condition; his breath smelling very strongly of liquor; and not in physical or mental condition to perform the duties of switchman; he, too, was released and switchman, C. E. Zeigler, called to replace him with Banks placed in charge of the crew. Butner instructed to report to you for investigation."

Gaskill then stated: "That report was left by Mr. Hagan; he also came by my house this morning at 6 A. M., and stated about the same; only that he told the men to show up in the morning for investigation." Gaskill then questioned plaintiff as follows: "Mr. Grimes, engine foreman, Butner is a member of the B. R. T. A. Yes, sir. Q. You are willing to represent him in this case? A. Yes, sir." Then follows a number of inconsequential questions asked plaintiff by Gaskill. Gaskill then inquired of plaintiff: "Q. When you reported for duty, what was your actual condition? Mentally and physically?" Plaintiff replied that his condition was good with the exception that he had a bad cold; that the doctor had instructed him to get some cough medicine, which he was taking—"I have it with me now." Then, in answer to another question, plaintiff stated that Hagan "gave me my lantern and I went and done what he said; waited for the train; when train came, he called up and gave orders as to how it should be handled. I don't believe I handled it in the manner, as he,

exactly, wanted me to; I probably did not just understand, what he wanted me to do; and how he wanted me to handle the cars. Q. You see Wilcox any time during the day? A. No, sir; only after we were sent home, when I saw you; you know what condition I was in when I was up to see you. You admitted I was in a good physical condition. Q. I said you looked all right; but I could smell liquor, which I did. A. You can smell this cough medicine if you want to. Q. Mr. Hagan's statement is plain. He stated you were in an intoxicated condition; and not fit, mentally or physically, for duty as an engine foreman. I have my own ideas in regard to this. Taking everything into consideration, I am of the opinion, the shock of being overtaken, would have a tendency of straightening a man out quite quickly, and that might have had something to do with your appearance when you came to my house at the ungodly hour of 3 A. M. I am glad you came, under the existing conditions. There is no doubt in my mind regarding the smell of liquor. When I stepped away from the fire; and the closer I got to you boys, the more I could smell the liquor. Far as Mr. Hagan's statement is concerned, I am going to stand on that statement, because he told me this morning that he is positively correct in charges placed against you and engine foreman, Wilcox. I am going to take the action required. The action will be: 'Dismissed, violation of Rule G.' Have you anything to say Mr. Grimes? A. Mr. Gaskill, do you think there is a possible chance of you, or Mr. Hagan being mistaken? A. (Mr. Gaskill) No, sir. A. (Butner) Dr. Owens said to get some cough medicine. Here is the bottle. (Mr. Gaskill and Mr. Grimes inspect and smell of the contents of the bottle.) Q. (RG) You were on duty one hour and 50 minutes? A. I went down, cleaned out No. 5, put caboose on; threw Milwaukee out, took tanks around the wye; took ahold of this drag to east lead; switched it; I had my cars and was pulling out; and he stopped us and told me to come on, that he was going to call another man in my place. Q. I know of no other one who could be more positive than Mr. Hagan; he saw you; he could get the facts as they actually were. I don't believe that Hagan would go on record, that way, unless he had good proof, in his own mind. A. It is circumstantial evidence. I was up to you within one hour's time; I was acting perfect then at least you said I was. I would just like to live. Q. I am unable to say what your actions were an hour before that. Mr. Hagan, apparently knows; he made it very plain: 'Intoxicated and unfit for duty.' A. I am denying it all. Q. That's all, Butner.''

Defendant's evidence further shows that Gaskill made a report of the hearing to Mr. Guild, the superintendent, who could either approve or disapprove of his decision, and that Gould discharged plaintiff.

Gaskill testified at the trial in the court below that he did not think it was necessary at the hearing to call Hagan but that if plaintiff

1142

had desired to examine him as a witness Gaskill would have postponed the hearing if plaintiff or Grimes had requested it.

Gaskill further testified that plaintiff and Wilcox came to his home about 3:00 A. M. of the morning that Hagan removed plaintiff and plaintiff wanted him to decide whether he was intoxicated. "They talked to me about being pulled off the engine by Hagan. I was standing pretty close to these two men. Butner asked me how he looked and I said, 'You look all right.' And I stepped pretty close to both of these men. They were both standing quite close together. Their faces were flushed, both of them and I could smell distinctly the odor of liquor on both men's breath. Wilcox didn't talk at all and Mr. Butner did most of the talking, and I told them that they could report for investigation the next day;" that he went to work the next morning about 6:00 A. M. and found on his desk the statement that was read to plaintiff and entered in the record at the hearing, signed by the initials of Hagan; that the copy of the proceedings introduced in evidence by defendant was a correct report of what occurred and nothing else occurred save what was shown therein.

On cross-examination the witness said that neither plaintiff nor Grimes stated that they had any witnesses they desired to be present, and that if they had so stated he would have postponed the hearing so that they could have had them present. Hagan, testifying for the defendant, stated that the written report that he made to Gaskill, which he described as a charge, stated the true facts; that he made it up about 2:25 A. M. and left it on Gaskill's desk; that he left work about 6:00 A. M. and went to Gaskill's house and explained to him "verbally all about both" Wilcox and plaintiff. He testified that Williams was not in the yards that night and that he did not tell plaintiff that he was and did not tell him "What do you want to do? Get us all fired?" He also testified that there was no tie-up of trains in the yards and that there was no "ball-up in the yards;" that at the time he removed plaintiff from duty he noticed that he was "a little too speedy with" the cars that he was switching. "He was kicking those cars too hard;" that he searched plaintiff and found no bottle upon him; that when plaintiff left "he was staggering drunk."

Defendant contends that its instruction in the nature of a demurrer to the evidence should have been given, for the reason that the evidence conclusively shows that plaintiff had notice of the charge made against him; that he knew that an investigation or hearing would be conducted; that plaintiff was given ample opportunity to present witnesses in his own behalf, and that the allegation that no witnesses were presented to testify against him was not proven.

We are of the opinion that defendant's contention concerning the evidence should be sustained with the exception as to the matter of presenting witnesses to testify against plaintiff. The written statement of Hagan, though informal, may be considered as containing the charges against plaintiff. While there is much conflict in plaintiff's

testimony in reference to whether or not he had notice of the hearing, and the charge against him, and whether he understood that he was being tried for being intoxicated while on duty, an examination of the record discloses unexplained admissions on his part, not necessary to set out herein, showing that he did know of these things and, also, that he must have known why he was being removed, that is, for being in an intoxicated condition while on duty. As to the opportunity of presenting witnesses in his own behalf, there is no dispute in the testimony that plaintiff did not tell Grimes that he had any witnesses and nothing was said at the hearing about any witnesses for plaintiff.

On the matter as to whether that part of Rule 24 was violated, providing that the plaintiff or his representative should be permitted to examine the witnesses, there was no witness against plaintiff at the hearing unless it was Gaskill. Defendant says that Gaskill, himself, was a witness. Gaskill stated at the hearing that he had seen plaintiff and knew that he had been drinking. He did not state that plaintiff was intoxicated. However, Gaskill's decision was not based upon what he knew about the matter, at least, not entirely so, for he stated, according to the transcript of the hearing, that he was going to stand on what was in Hagan's statement and on what Hagan had told him that morning.

It, therefore, appears from the transcript of the hearing that plaintiff was dismissed from service largely, if not wholly, upon information furnished by Hagan. Neither plaintiff nor Grimes were given an opportunity to examine Hagan. However, defendant states that if plaintiff had desired that Hagan be present all he had to do was to make the request. Of course, it was not plaintiff's duty to produce Hagan as a witness, or some one else who could substantiate Hagan's charges, but that duty was upon Hagan. So far as the transcript of the hearing shows, plaintiff did not know that Hagan was not going to be produced until Gaskill announced his decision—"Dismissed, violation Rule G."

In addition to this, the transcript of the hearing and defendant's evidence in the court below, standing alone, shows that plaintiff was not given a fair hearing by Gaskill, as provided by Rules 12 and 24. At the very outset of the hearing Gaskill read the charges but no witness was produced by anyone to substantiate them. Gaskill immediately put plaintiff on the defensive and while, neither plaintiff nor Grimes made any statement showing that plaintiff was guilty of the charges, (plaintiff denied them) Gaskill announced that, in view of the charges made by Hagan and his talk with him and what occurred at Gaskill's house that morning, his decision was that plaintiff be dismissed on account of his violation of Rule G. Every question propounded in the hearing was that of Gaskill. Grimes did not ask plaintiff a single question prior to the announcement of Gaskill's decision. It is quite apparent that Gaskill had decided before the hearing, to discharge plaintiff unless, possibly, the latter were able

to exculpate himself. As before stated, plaintiff denied the charges without avail. There was no testimony whatever taken against plaintiff unless it be the statement made by Gaskill, himself. While Rules 12 and 24 contemplate that the hearing be held by layman, and technical rules of procedure in courts of justice are not applicable to a trial of this kind, yet, all reasonable men, including laymen, understand that a hearing conducted by a man, who has substantially prejudged the case, as defendant's evidence shows Gaskill had done in this instance, is not a fair and impartial one.

As to Gaskill's so-called testimony at the hearing, a trial by a man who acts as judge, jury and witness, (in this instance the sole witness against plaintiff) is an unheard of procedure. Gaskill's decision was largely based upon Hagan's charges and what the latter had told him, and not upon what occurred at Gaskill's house that morning. If this proceeding could be dignified by the name of a trial or hearing, it certainly was not a fair hearing.

It is true that after Gaskill announced what his decision was, he asked Grimes if he had anything to say, and Grimes merely asked if Gaskill did not think it was possible that the latter or Hagan might be mistaken. Defendant now says that there was no objection made by plaintiff or Grimes that the hearing was conducted by a man who was not fair and impartial. However, there is nothing in the record to indicate that any objection by plaintiff or Grimes to Gaskill's hearing the matter would have been effective. There is nothing in Rules 12 and 24 indicating that, if defendant refused or failed to provide an impartial official to hear charges against an employee, the latter would have the right to object to the one furnished. The rules do not contemplate that defendant would not furnish an impartial official to hear the charges.

We think that plaintiff is entitled to recover upon defendant's testimony, alone, if he was, as a matter of fact, not intoxicated while on duty at the time in question. It appears from the evidence, and the instructions asked and given on behalf of both parties, that the case was tried on the theory that, even though the hearing was conducted in violation of Rules 12 and 24, nevertheless, defendant had a right to discharge plaintiff, if he was, in fact, intoxicated at the time in question. We will so dispose of the case here. So, the sole and only issue that was required to be submitted to the jury was whether or not plaintiff was so intoxicated.

This issue was covered by plaintiff's Instruction No. I and defendant's Instruction "K." Although defendant complains of the giving of plaintiff's instructions and the refusal of defendant's in reference to the issues concerning the violation of Rules 12 and 24, in our view of the case such questions are not now material.

Defendant contends that plaintiff did not plead that he did not have a fair and impartial trial but, merely, that he had no notice in advance of the hearing or the nature of the charges placed against

him; that he had no notice of the time or the place of the hearing, or given an opportunity to have witnesses present in his behalf, and that no witnesses were present to testify against plaintiff.

If the allegations of plaintiff's petition, taken as a whole, could be said to be confined to these matters, alone, yet, the issue as to whether there was a fair and impartial hearing, generally, was raised in defendant's answer wherein it alleged that "pursuant to such suspension and notice, the plaintiff did during the day of February 25, 1932, report to said general yardmaster, who conducted a *full, complete, fair and impartial hearing.*" (Italics ours.) Under the doctrine of express aider the issue as to whether or not plaintiff had a fair and impartial trial was in the case. [49 C. J., p. 866; Krum v. Jones, 25 Mo. App. 71; Garth v. Caldwell, 72 Mo. 622, 629, 630.]

It is insisted that the court erred in refusing the defendant, on cross-examination of plaintiff, to ask him whether he drank liquor while he was at Lone Jack, his home. In this connection, defendant offered to prove by plaintiff that he was a habitual user of intoxicating liquor and that that fact was generally known among the people with whom he associated; that his reputation was that of a drinking man. In this connection, the record shows that on cross-examination, plaintiff was asked by defendant: "Q. How far is that (Lone Jack) from Kansas City? A. About thirty miles. Q. When your deposition was taken you remember I asked you if you ever drank at all at Lone Jack? A. Yes, sir. Q. You said you didn't? A. Yes, sir. Mr. Randolph: We object to that; the specific question and answer are the best evidence. Q. Without referring to your deposition, did you drink liquor while you were at Lone Jack?"

Thereupon, plaintiff objected to the question, which was sustained, and the offer of proof was made. Thereafter, plaintiff introduced the deposition of some witnesses. In none of the questions asked by plaintiff of these witnesses when their depositions were taken were they asked concerning plaintiff's drinking liquor, except in reference to the time in controversy. But some of them volunteered the information that plaintiff was not a drinking man, and one of them, upon cross-examination by defendant, stated that he did not know whether plaintiff was a drinking man.

However, plaintiff read all of the testimony, including the cross-examination of these witnesses. Thereafter, defendant again asked plaintiff if he took a drink during the time he was there in Lone Jack. The court again ruled out the question. However, defendant was finally permitted to interrogate several witnesses introduced by it on the question as to whether or not plaintiff took a drink and was a drinking man. Some of them testified in the affirmative.

Defendant contends that plaintiff, having opened up the subject as to whether or not plaintiff was a drinking man and whether he ever drank while living at Lone Jack, and whether or not plaintiff

used intoxicating liquor, defendant had a right to question plaintiff relative to the matter even though the testimony were otherwise incompetent.

It appears that it was defendant who first sought to get this matter into the record. But however that may be, we do not think that the court committed reversible error in regard to the matter. If plaintiff had been permitted to answer the questions he would have stated that he did not take a drink or drink at Lone Jack. Defendant was permitted to prove by other witnesses that he did. This was a matter not material to the real issue, that is whether plaintiff was intoxicated when he was removed from duty by Hagan. We fail to find where defendant was prejudiced. While defendant claims that it was competent, under Rule G, to show that plaintiff used intoxicating liquor, plaintiff was not tried by Gaskill for any matter except that of being intoxicated while on duty, and the defense pleaded in the answer is based wholly upon the theory that plaintiff was tried and discharged on this charge.

Defendant contends that the court erred in permitting plaintiff to show that he had several times requested a copy of his service letter from the defendant and that defendant refused to give it to him.

The facts in this connection show that plaintiff was contending in his testimony that he did not know for what cause he was dismissed. Defendant sought to show by cross-examining plaintiff that he was given a service letter and that it stated that he was dismissed "on account of violation of Rule G." Plaintiff testified that he signed a receipt for the service letter and a copy of the proceedings but that he never received them, but that the same were to be delivered to Grimes. Grimes, testifying for defendant, stated that he received them and mailed them to the plaintiff. Plaintiff stated that he never received them through the mail, or, otherwise.

Defendant produced what it stated to be a copy of the service letter with plaintiff's name signed to it, as a receipt for the same, and questioned plaintiff regarding it. Defendant's counsel read from the copy of the service letter as follows: "Q. (Reading) 'February 25, 1932 dismissed account violation Rule G.' You never knew that was the reason they gave you? A. No, sir. I asked for a copy. I believe it is in my files—Mr. Randolph's files, that they denied me; they told me that they did not issue duplicate service letters, and I asked them also again for a copy of the statement they taken, a copy of the statement they taken when they held the investigation and called in my engineer and my helpers, wanted to know what was going on, what I really was fired for."

On cross-examination, plaintiff was asked: "Q. Mr. Butner, on this Exhibit C (copy of service letter) that Mr. Brown showed you, it appears to be a typewritten signature and not a written signature. Can you tell this jury approximately how many times you asked for

a copy of the service letter that you signed for with Mr. Grimes? Mr. Brown: That is objected to for the reason it is wholly immaterial in this case as to whether he asked for a copy or not. There is no law providing that he can get a copy and it has nothing to do with this case. It is the universal ruling that no copies are given out and he has testified that he directed the original to be turned over to his representative and he got it. Mr. Randolph: We want to show that he was trying to get a copy of this letter and a copy of this alleged hearing and never could get it. The Court: Objection overruled. To which action of the court in overruling said objection the defendant then and there at the time excepted and still excepts. Mr. Randolph: Q. You tell this jury about how many times you have asked this company for a copy of the service letter that you signed for that you say Mr. Grimes got? A. I asked them for it once and I asked them for a copy of the statements, and the like of that, they had taken from the members of my crew any number of times. Q. Well, what do you mean by any number of times? A. Lots of times. Q. Well, were you ever able to get a copy of your service letter or a copy of those statements? A. No, sir."

Later, plaintiff offered a letter written to him by Guild in answer to a request by plaintiff for a duplicate service letter. At that time defendant's counsel stated: "If this is offered for the purpose of showing that they do not issue a duplicate, duplicate service letters, I have no objection whatsoever." Guild's letter that "We do not issue duplicate service letters."

Defendant now insists that the testimony that plaintiff had made several requests for a copy of the service letter was prejudicial to it; that "this was an attempt to say to the jury that the company arbitrarily many times refused to give this man a copy of his service letter and to lead the jury to believe that because they were arbitrary in that that, they must have been arbitrary in dismissing plaintiff."

Defendant, before plaintiff went into the matter, had brought out from plaintiff that he had asked for a copy of his service letter and that it was denied him. The evidence shows that defendant did not issue duplicate service letters and defendant, in its brief, argues that it was guilty of no wrongful act because it failed to give out such copies. There is nothing in the record to disclose any contention at the trial on the part of plaintiff, or his counsel, that defendant was guilty of misconduct on its part, in its refusal to give plaintiff a copy of the letter. Plaintiff was trying to excuse himself for not knowing why he was discharged, as he claimed. We think that, defendant having first brought out the fact that plaintiff had asked for a copy of his service letter, and it was refused him, was not prejudiced by what subsequently occurred. [See Gaty v. United Rys. Co., 251 S. W. 61; Keys v. Chi. B. & Q. R. R. Co., 31 S. W. (2d) 50.]

There was no error in the action of the court in refusing to permit defendant's witnesses, who were familiar with hearings conducted by defendant, to testify that the written report of the proceedings at the hearing showed that plaintiff was given a fair and impartial hearing. This was one of the main issues of fact that the jury was called upon to determine, if it was such an issue, but we have already held, as a matter of law, that plaintiff was not given a fair and impartial hearing. It was no excuse for the failure of defendant to give him one, that it customarily conducted hearings of this character in the same manner.

Defendant complains of the refusal of the court to admit in evidence its Exhibit E. Exhibit E appears to be a carbon copy of Exhibit G, an affidavit signed by plaintiff. This affidavit tends to contradict plaintiff on the question as to why he was discharged. When shown Exhibit E plaintiff denied that he signed the original. Defendant was not then in possession of the original but subsequently obtained it and plaintiff then admitted that he had signed Exhibit G. Defendant says that this circumstance reflected upon plaintiff's credibility as a witness. Exhibit E was introduced in evidence by defendant during the argument of the case to the jury and, if it was not read to the jury, as defendant says, that was its fault.

However, it is insisted that the court erred in refusing to give defendant's Instruction "J." This instruction reads as follows:

"The court instructs you that the term of plaintiff's employment by the defendant was indefinite, the defendant having the power to terminate such employment at any time it saw fit, there being no obligation resting upon the defendant of any kind or character to continue the plaintiff in its employ, and you are further instructed that the defendant had the right to discharge the plaintiff for violation of Rule G, described in the evidence."

The court gave, at the request of the defendant, Instruction "K," as follows:

"The court instructs the jury that if you believe and find from the evidence that the plaintiff had violated Rule G, described in evidence, and was discharged by reason and on account thereof, then without regard to any other fact or circumstance in evidence, your verdict will be in favor of the defendant."

In this connection defendant points out that plaintiff testified that his term of employment was indefinite. Defendant says that, in view of this, it had a right to discharge plaintiff without a hearing except "for an alleged fault." We are not called upon to pass upon the question as to whether or not defendant had the right to discharge plaintiff without a hearing except for an alleged fault, for the reason that no such issue is presented in this case. He was discharged for an alleged fault and such was the reason pleaded in the answer. The answer pleaded that the only reason that plaintiff was discharged was because he violated Rule G.

There was no error in refusing to give defendant's Instruction "J."

It appears that plaintiff attempted at various times to be reinstated in his employment and, at one time wrote a letter to defendant stating: "I realize that I did wrong and I have paid a great price for it, and I assure you that if given another chance you will never have cause to regret it."

Defendant says that by this letter plaintiff admitted that he was drunk when Hagan suspended him. Plaintiff testified that what he meant when he said that he realized that he had done wrong, was that he had done wrong in associating with Wilcox. Of course, his explaination was a question for the jury, but even if the letter should be construed as an admission that he was drunk, it was not a conclusively binding upon plaintiff, for the reason that it constituted an extrajudicial admission, and he denied at the trial that he was drunk. [Davidson v. Frisco Ry. Co., 301 Mo. 79, 86.]

The judgment is affirmed. All concur.